UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MICHAEL DEJUAN POWELS,

      Petitioner,

                        CASE NO. 2:12-CV-10775

v.                       JUDGE BERNARD A. FRIEDMAN

                        MAGISTRATE JUDGE PAUL J. KOMIVES

CINDI S. CURTIN,

      Respondent.[1]

_____/


**<u>REPORT AND RECOMMENDATION</u>**

I.    <u>RECOMMENDATION</u> .................................................................. 2
II.   <u>REPORT</u> ............................................................................ 2
    A.   *Procedural History* ............................................................ 2
    B.   *Factual Background Underlying Petitioner's Conviction* ............................. 5
    C.   *Standard of Review* .......................................................... 16
    D.   *Prosecutorial Misconduct (Claims II-III, VI)* ................................... 19
        1.   *Improper Comments* ..................................................... 20
            a. Clearly Established Law ................................................ 20
            b. Analysis ............................................................. 21
        2.   *False Evidence* ........................................................ 27
            a. Clearly Established Law ................................................ 27
            b. Analysis ............................................................. 29
    E.   *Evidentiary Claims (Claims IV & V)* ........................................... 30
        1.   *Hearsay Evidence* ..................................................... 31
        2.   *Confrontation* ........................................................ 33
            a. Clearly Established Law ................................................ 33
            b. Analysis ............................................................. 36
    F.   *Jury Instructions (Claim VIII)* ............................................... 37
        1.   *Clearly Established Law* ................................................ 37
        2.   *Analysis* ............................................................. 38
    G.   *Counsel Claims (Claims I, VII-VIII)* .......................................... 39
        1.   *Denial of Counsel* .................................................... 39
        2.   *Ineffective Assistance* ................................................ 43
            a. Clearly Established Law ................................................ 43
            b. Alibi Witnesses ...................................................... 45
            b. Res Gestae Witnesses ................................................. 47
            c. Failure to Object .................................................... 49
    H.   *Recommendation Regarding Certificate of Appealability* ........................... 50
        1.   *Legal Standard* ...................................................... 50

_____

     [1]By Order entered this date, Cindi S. Curtin has been substituted in place of Paul Klee as the proper respondent in this action.

2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

I.     *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

III.     <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

\*     \*     \*     \*     \*

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.    <u>REPORT</u>:

A.    *Procedural History*

1.     Petitioner Michael Dejuan Powels is a state prisoner, currently confined at the Oaks Correctional Facility in Manistee, Michigan.

2.     On December 7, 2007, petitioner was convicted of second degree murder, MICH. COMP. LAWS § 750.317, following a jury trial in the Wayne County Circuit Court. On January 3, 2008, he was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 769.12, to a term of 45-70 years' imprisonment.

3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.     MR. POWELS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO INVESTIGATE AND PRESENT A LEGITIMATE ALIBI DEFENSE, WAIVED RES GESTAE WITNESSES WITHOUT ADEQUATE INVESTIGATION, FAILED TO SECURE A MISSING WITNESS INSTRUCTION, FAILED TO OBJECT TO INADMISSIBLE HEARSAY AND PROSECUTORIAL MISCONDUCT, AND PREVENTED HIM FROM FULLY DEFENDING AGAINST THE CHARGES AND CONFRONTING THE EVIDENCE, IN CONTRAVENTION OF MR. POWELS' SIXTH AND FOURTEENTH AMENDMENT RIGHTS, AND CONST. 1963, ART. 1, §§ 17, 20.

II.     THE TRIAL COURT'S DENIAL OF A MISTRIAL FOLLOWING ARGUMENT BY THE PROSECUTOR WHICH INFRINGED UPON THE ATTORNEY-CLIENT PRIVILEGE, AND WHICH SUGGESTED

DEFENSE COUNSEL HAD SOME SPECIAL KNOWLEDGE OF THE OFFENSE FROM MR. POWELS, WAS AN ABUSE OF DISCRETION AND DENIED MR. POWELS HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL BY IMPARTIAL JURY AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.

III.    MR. POWELS WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL BY IMPARTIAL JURY AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS BY PROSECUTORIAL MISCONDUCT.

IV.    THE TRIAL COURT ERRONEOUSLY ALLOWED MR. TATE TO TESTIFY ABOUT WHAT HE HEARD TWO YOUNG MEN SAY ON THE STREET; THE HIGHLY PREJUDICIAL EVIDENCE VIOLATED MR. POWELS' SIXTH AMENDMENT RIGHT OF CONFRONTATION, FAIR TRIAL, AND DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS AND CONST. 1963, ART. 1, § 17.

Petitioner also filed a *pro se* supplemental brief, raising four additional claims:

I.    DEFENDANT-APPELLANT WAS DEPRIVED OF DUE PROCESS WHERE THE PROSECUTOR WAS ALLOWED TO USE A STATEMENT THAT WAS EDITORIALIZED BY DETECTIVES, AND WHERE THE WITNESS TESTIFIED THAT HE DID NOT SAY, WRITE, OR GIVE PERMISSION TO WRITE THOSE IN AN EDITORIALIZED MANNER AND TRIAL COUNSEL WAS INEFFECTIVE.  US CONST. AMS VI & XIV.

II.    DEFENDANT-APPELLANT WAS PREJUDICED BY BEING DENIED HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS, AND A FAIR TRIAL DUE TO POLICE/PROSECUTOR MISCONDUCT CONCERNING FALSE TESTIMONY AND MISREPRESENTED MATERIAL EVIDENCE TO THE JURY.

III.    DEFENDANT-APPELLANT WAS DEPRIVED OF HIS LIBERTY AND EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL WAS ABSENT DURING THE ENTIRE PRETRIAL PERIOD WHICH CONSTITUTES A CRITICAL STAGE OF THE PROCEEDINGS AND FAILED TO SUBJECT THE PROSECUTION'S CASE TO MEANINGFUL ADVERSARIAL TESTING IN VIOLATION OF THE SIXTH AMENDMENT AND CAUSED THE ADVERSARIAL PROCESS TO BE PREJUDICED, THE ERRORS AND DEFICIENCIES OF COUNSEL INDIVIDUALLY AND CUMULATIVELY PREUDICED MR. POWELS.

3

IV.   DEFENDANT-APPELLANT WAS PREJUDICED BY BEING DENIED HIS FEDERAL CONSTITUTIONAL RIGHTS TO LIBERTY, DUE PROCESS, AND A FAIR TRIAL DUE TO ERRONEOUS JURY INSTRUCTIONS AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT.

The court of appeals remanded the matter to the trial court for an evidentiary hearing on petitioner's ineffective assistance of counsel claims.  Following the hearing, the trial court denied petitioner's motion for new trial on the basis of ineffective assistance of counsel.  *See People v. Powels*, No. 07-009813-01FC (Wayne County, Mich., Cir. Ct. July 23, 2009) [hereinafter "Trial Ct. op."].  The court of appeals subsequently found no merit to petitioner's claims, and affirmed his conviction and sentence.  *See People v. Powels*, No. 283213, 2010 WL 3238927 (Mich. Ct. App. Aug. 17, 2010) (per curiam).

4.   Petitioner sought leave to appeal these issues to the Michigan Supreme Court, as well as two additional issues: (1) insufficient evidence; and (2) ineffective assistance of appellate counsel. The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Powels*, 489 Mich. 932, 797 N.W.2d 162 (2011).

5.   Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on February 21, 2012.  As grounds for the writ of habeas corpus, he raises the eight claims that he raised in the Michigan Court of Appeals.

6.   Respondent filed her answer on August 27, 2012.  She contends that portions of petitioner's third and fourth claims, and all of his fifth, sixth, and eighth claims, are barred by petitioner's procedural default in the state courts, and that all of petitioner's claims are without merit.

7.   Petitioner filed a reply to respondent's answer on October 11, 2012.

4

B.    *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the June 18, 2006, shooting death of Robert Sawyer.  The

evidence adduced at trial was accurately summarized in the prosecutor's brief in the Michigan Court

of Appeals:

> Sonya Carter testified that she knew Robert Sawyer during his lifetime. Sawyer was the father of her four-year-old daughter LaJordan Sawyer.
>
> In the early morning hours of June 18, 2006, she was at the home of her friend Danielle Belin, who lived on Appleline.  Also at Danielle's home, besides she and Danielle, were Tee-Tee, whose real name was Trianitous Skinner, Goldie, whose real name was Michael Watson, and who was Danielle's brother, and Monett, a female.  Sometime between 6:30 and 7:00 a.m., as she was laying on the couch in the front room, Robert Sawyer kicked the door in.  She jumped up and got into a tussle with Sawyer.  Sawyer was angry and kept asking her where the baby was.  It appeared that Sawyer had been drinking.  As she and Sawyer tussled, he struck her in the face, causing her face to swell.
>
> The baby was not there; she was at her (the witness's) cousin LaTonya's house on Elmhurst, which was a four family flat.  The upstairs part of the four-family flat on Elmhusrt was vacant.  Danielle's mother, Arqueen Watson, and her brother Michael (Goldie) lived across the hall from LaTonya.
>
> She and Sawyer were no longer boyfriend-girlfriend, but she did tell him where the baby was, that is, over at her cousin LaTonya's.  She told Sawyer that they would both go get the baby and they both proceeded out the door.  When they got out onto the porch, she turned around and locked the door and Sawyer turned around as well and accused her of hesitating.  She actually was hesitating when she saw the look on Sawyer's face; it was just a cold stare, as if he was not there.  At that point, she and Sawyer started fighting again, right there on the porch.  Sawyer tried to pull her off of the porch.  She was wearing a ponytail and Sawyer pulled that and it came off.  That is when she ran back into the house.  Sawyer followed her back in before she could lock the door.  She went towards the basement and Sawyer went towards the back bedroom where Tee-Tee was.  Sawyer then came out of that room and went upstairs.  She heard Sawyer asking all the while where his baby was and saying, "Y'all think I'm playing with y'all".  She could hear, from where she was on the basement steps, that he was now in the kitchen, so she ran all the way down into the basement.  Sawyer came down into the basement and she went to the right in the basement and Sawyer went to the left.  Goldie (Michael Watson) and his girlfriend Monett were in that part of the basement where Sawyer went.  She could hear Sawyer asking them where his baby was, and she heard Goldie respond that he had his own baby and asked him what he was talking about.  She heard Sawyer say again, "Y'all think I'm playing with y'all," and then she heard a scuffle.  She heard Goldie tell Sawyer to get out of his (Goldie's) sister's house "with this shit," and

then she saw Goldie and Sawyer going up the stairs with Goldie holding Sawyer's shirt. The two then went outside. She then saw, from the front door, Goldie holding Sawyer down on the ground. Eventually Goldie let Sawyer up and Sawyer left in the vehicle that he had come in, a burgundy Lumina, which was the car that Sawyer usually drove. Goldie then came back in the house.

About fifteen minutes later, Goldie and Monett left in Goldie's silver 300M. She and everybody else who stayed at the house went into the backyard. Then, 20 or 25 minutes later, Sawyer returned to the house, pulling his Lumina up into the driveway. When Sawyer pulled up, she, Danielle, and Tee-Tee ran to the side of the house because they thought that Sawyer was going to come into the backyard. When she saw Sawyer get out of his car, she saw that he had a handgun in his hand. Sawyer went into the house with the handgun; he never did come out into the backyard. She could hear Sawyer walking around in the house; he wasn't saying anything. Then, Sawyer came out of the house, got back in his car, put his hand out of the car window, the hand with the gun in it, and fired five or six shots. She did not know in which direction he was firing. When this happened, Danielle ran off towards the back of the house and then towards the street behind the house. Sawyer then went north on Appeleline towards Schoolcraft. After that, she called the police using her cell phone.

After Sawyer left, Michael Watson (Goldie) came back to the house, not in the vehicle that he left in, the silver 300, but in a white truck. She had seen Watson driving this vehicle before. A person she knew only as Tooty was with Watson in the truck. She identified Defendant in court as Tooty. She thought that Watson was driving the truck, but she was not sure. She also saw Danielle get out of the truck (recalling that Danielle was Michael Watson's sister and that Danielle had run to the street behind the house). She, Danielle, and Tee-Tee went into the house, grabbed their purses and cell phones, and went to the police station on Grand River and Schaefer to make a report about Sawyer. It took them two or three minutes to get to the police station. While she was talking to the officer at the Schaefer station and he was telling her that she had to go to the police station on Cass, which was the domestic violence location, Danielle told her that Sawyer had shot himself. She told the officer at the Schaefer station about what Danielle had told her and the officer told her she still needed to go to Cass. They all then went to the Cass station which took 15 or 20 minutes. While they were there, Sawyer's father called her and gave her the status of Sawyer. After they left the Cass station, they all went to the Elmhurst address where her cousin and Danielle's mother lived. The police were there and they took a statement from her and Danielle. She told the police that Michael Watson and Defendant had been together in the white truck.

On cross-examination, the witness acknowledged that there was no mention of Tooty in her written statement to the police.

James Tate testified that he knew Defendant, whose nickname was Tooty, and he also knew Michael Watson, whose nickname was Goldie. He had known them both for 11 or 12 years; they had all grown up together. He also knew Robert Sawyer in the same fashion. He had no problem with any of these people on June

6

18, 2006.  He considered all of these people friends on June 18.  He did not know of any problems between any of these people on June 18.

On June 18, which was Father's Day, at around 6:00 a.m., he was over at a friend's house on Taylor at the corner of LaSalle; he had stayed the night there.  He had been hanging out with Sawyer the night before, after which he went back to the house on Taylor.  At around 7:00 or 7:30 a.m., Sawyer showed up at the house on Taylor, looking mad.  Sawyer's clothes appeared to be a little torn and he said that he had been in a little scuffle with Michael Watson.  He sat there listening to Sawyer while, at the same time, trying to put his clothes on, but Sawyer left before he could get dressed.  By the time he got to the front of the house, Sawyer was already gone.  He sat with another friend on the front porch and tried calling Sawyer's phone, [but] Sawyer would not answer.

About a half hour to 45 minutes later, he saw Defendant with Michael Watson.  They were in a white truck, an SUV; Defendant was driving and Watson was the passenger.  They drove past the house he was at on Taylor; while driving past, Defendant looked at him.  Defendant and Watson made a quick turn onto LaSalle, and then, about five minutes later, he heard eight to ten gunshots.  A crackhead came down the street and told them that a car had been shot up.  Just then, one of his friends pulled up, and he and the person who he was with jumped in the friend's car and went to the scene where the shot-up car was, which was one block from Taylor and LaSalle.  It took them three to five minutes to get to the scene.  There was one police officer on the scene when they got there.  There were also other people around as well, including two members of Michael Watson's family.  Among the other people there were two boys, Antonio and John – two young people from the neighborhood.  He knew Antonio's mother.  While he was there, the ambulance pulled up and took Sawyer out of the car.  The police officer on the scene would not let anybody get real close to the car, but he was able to get close enough to see what was in the car.  All of the car doors were open.  What he saw in the car was one gun on the front seat and two guns on the back seat.  He had never seen Sawyer with these guns before.  He had been riding in that car, the burgundy Lumina, the night before, and the guns had not been in there then.

He heard the two boys, Antonio and John, talking about how the car got shot up.  The two boys were excited as they talked.  What he heard them say was that a white truck had pulled up and there was shooting back and forth.  Refreshing his memory [with the statement] that he gave to Investigator Fisher, the witness testified that Antonio and John said that the white truck involved in the shooting was the one that Goldie and Toot usually drove around in.

On cross-examination, the witness testified that Sawyer told him that the fight between him and Goldie (Michael Watson) was over Goldie moving in on Shane Carter (the previous witness).

Detroit Police Officer Moises Jiminez testified that he was assigned to the Homicide Section.  He testified that he was involved in the investigation of this case.  That is, he did the written report relative to the scene investigation.  In his report, he listed the nicknames of two suspects: Tooty and Goldie.  He got these two nicknames

from listening to one Ms. Carter, the girlfriend of the victim, when she was interviewed by Investigator Fisher.

When he arrived at the scene of the shooting on June 18, 2006, the victim had already been removed from the vehicle by a medical team. There were three guns in the vehicle: a .45 caliber handgun and two 9 millimeter high point rifles. After he and Investigator Fisher left the scene, they went to an address on Elmhurst, where there was a four-family flat; this was where they talked to Ms. Carter.

Efran Johnson testified that on June 18, 2006, he was a cab driver. At about 8:00 a.m. on June 18, he was in his cab, stopped at a red light on 14th Street at the intersection of Clairmont. He was in the far right lane. There was a burgundy Lumina right next to him on his left. Out of his rear-view mirror, he saw a white or cream colored SUV approach the intersection at a high rate of speed. It looked like the SUV was not going to stop for the red light. The SUV went on the left side of the burgundy Lumina, so that the passenger side of the SUV was next to the driver's side of the Lumina. When the SUV got on the left side of the Lumina, he heard gunfire and saw flashes of gunfire and then heard glass breaking. He ran the red light and got out of there. He did not see who was in the SUV. He did see a person in the burgundy Lumina; it was a black male.

The witness acknowledged giving a written statement to Sergeant Gnatek on June 21, 2006. He acknowledged that in that statement, he had said that as the SUV pulled up, "[he] saw the front passenger window down and [he] saw handguns sticking out of the window and the gun firing six or seven times into the burgundy car." He testified that that was a truthful statement.

On cross-examination, however, the witness testified that he never saw any gun, and that he never told the officer that he did see a gun.

On redirect examination, the witness testified that as he was stopped at the red light, he glanced over at the Lumina. All that he saw was the man in the Lumina waiting on the red light as well. He did not see the man with a gun or anything else. It was as soon as the white SUV got up next to the Lumina that he saw flashes and heard gunfire and glass breaking.

On recross, the witness was asked if the Lumina was shooting at the van (sic) or the van was shooting at the Lumina or they were shooting at each other. The witness responded that it did not seem that the Lumina was shooting at all; rather, the fire was coming from the SUV and the man in the Lumina did not have a chance to do anything.

Danielle Belin testified that she was the sister of Michael Watson. She had known Defendant, identifying him in court, for about 15 years. Defendant and her brother were pretty close friends. Defendant's nickname was Tooty and her brother's nickname was Goldie. She had also known the deceased Robert Sawyer. She knew of no problems between Sawyer and her brother and Defendant.

In the early morning hours of June 18, 2006, she was in her bed asleep. Sonya Carter, also known as Shane, and Tee-Tee were also at her house at that time. Sonya stayed at her house quite frequently. She knew that Sonya had a baby with Sawyer.

8

She was awakened on June 18 when Sawyer came running into her room and said to her, "Bitch, y'all think I'm playing. Where she at?" Sawyer then went to the stairway to go back downstairs, but before doing so, he turned around and repeated, "Y'all think I'm playing." She did not hear anything else going on in the house nor did she go downstairs. She did not even know that her brother Michael Watson was over there. Then Tee-Tee ran upstairs and said to call 911. They just waited up there, and, not hearing anything, she and Tee-Tee went downstairs. When they got downstairs, she saw Michael's girlfriend, Monett, who was now deceased, at the door; that is how she knew that her brother was there. Shane and Tee-Tee also went to the door and she did too, but she was last in a row. She did not see her brother outside, but as Sonya (Shane) was going to the bathroom with a rag on her face, she (Sonya) said that Goldie and Robert were outside. She went back upstairs and called 911.

After she called 911, her brother came back in the house. She looked out the dining room window and saw Robert Sawyer out there. Sawyer was standing there, in the driveway, with the door of his burgundy car open. Sawyer seemed to be in a daze and he just stood there looking at the house for a few minutes. Then, Sawyer pulled off. Her brother and his girlfriend sat there for a while and asked her if she needed any help cleaning up because her house had gotten torn up.

After awhile, her brother and his girlfriend left. After they left, she was out in the backyard cleaning up and gathering up the rental chairs after a birthday party that they had had back there the night before. As they were back there, Sonya told her that Robert was there. She and Sonya dropped the table that they were holding and ran to the side of the house. She saw that Robert had come back in the same car that he had left in. He parked in the driveway and left the driver's side door open. When Sonya said that Robert had a gun, she grabbed her cell phone that was in the backyard and ran through the backyard to the street behind her. She called 911 again and her mother and then she called her brother Michael. She asked him where he was and told him to come and get her. Her brother came in a white truck. He found her on the next street over, on Steel. He drove her and Tee-Tee and Sonya back to her house. Defendant was not in the white truck. When they got to her house, her brother just dropped them off and she got her keys and purse and took Sonya to the police station on Schaefer and Grand River. While they were there, Tee-Tee got a call that Robert had been shot. She and Tee-Tee went into the police station and told Sonya. They did not know at that time that Robert was dead. When they left the Schaefer police station, they went to another police station, where the domestic violence unit was.

When they left there, they went to her mother's house on Elmhurst. When they got there, there were two detectives sitting there. She was interviewed by these officers and she saw Sonya being interviewed by them.

She never saw her brother after the shooting. She had talked to him since June 18, but he would not say where he was.

Assistant Wayne County Medical Examiner Leigh Hlavaty testified that she performed the autopsy on the body of Robert Sawyer on June 19, 2006. The cause

of death was multiple gunshot wounds and the manner of death was homicide. She saw four shotgun wounds on the body. She could tell that the gunshot wounds were from a shotgun because of the diameter of the wounds, shotgun wounds being bigger than those caused by a handgun, and because she also recovered a shotgun pellet from one of the wounds.

One shotgun wound had an entrance pellet wound on the bridge of the nose. The tract of this wound passed through the facial soft tissue and the nose and exited on the right cheek. This same pellet re-entered the right cheek and exited the right cheek. The wound tract was from left to right and slightly downward. Another of the shotgun wounds was a graze wound on the front left forearm. A third shotgun wound was on the lower left chest. The wound tract went through two ribs and the left lung and exited on the left back, causing bleeding into the left chest cavity. The tract of this wound was front to back and slightly downward. The fourth shotgun wound had its entrance on the left lower back. The pellet went through loops of the small bowel and the left kidney before it lodged in the liver, causing bleeding into the abdomen. The pellet was recovered from the liver.

There were areas of pseudostippling associated with the shotgun wounds. In fact, all of the wounds except the one on the forearm had pseudostippling. Pseudostippling were small injuries that occurred when a projectile struck an intermediate target before reaching the body. What would happen in such [a] circumstance was that the intermediate object would cause the projectile to fragment and the fragments were what caused the small injuries. The deceased had these injuries on his face, on his lower left chest, and on his lower back, as well as on the skin of the left shoulder, the right forearm, and the lateral left thigh. Firing a shotgun through a closed window would cause pseudostippling.

Finally, the witness testified that toxicology testing showed that the deceased had a blood/alcohol level of 0.14.

Detroit Police Officer Derrieck Riley testified that he was on patrol duty on June 18, 2006. At around 8:15 a.m., he and his partner, Officer Charles Adams, went to the location of 14th and Clairmount in response to a dispatch to that area. When they arrived there, he observed a burgundy Chevy Lumina with a man lying across the front seat towards the passenger side. The vehicle had several bullet holes on the driver's side, on the driver's door, and around the driver's door and window, throughout the driver's side really. The windows of the vehicle were broken. There were two long guns in the front compartment of the vehicle, on the front seat with the man, and a handgun on the passenger side floor; he did not recall if the long guns were on the front seat or on the floor of the front compartment. EMS arrived shortly after they arrived. The man in the vehicle showed no vital signs.

He and his partner notified the Homicide Section and stayed there until officers from that section arrived.

Detroit Police Evidence Technician Latrelle McNairy testified that she responded to the scene at 14th and Clairmount at around 9:50 a.m. At the scene, she observed a vehicle that had crashed into another vehicle. This was at Taylor and 14th, which was approximately one block south of Taylor and Clairmount. She

10

talked to Officer Fisher, who was the officer in charge of the scene. There was nobody inside of the vehicle that had crashed into the other vehicle, but there was shattered glass inside the vehicle as well as blood-soaked garments in the front seat. There were three firearms, a .45 caliber semi-automatic handgun and two nine millimeter semi-automatic rifles, on the hood of the vehicle, the vehicle being a burgundy Chevy Lumina. There was a box of live ammunition on the floor of the front passenger area. There were six bullet impact strikes on the driver's side door, four bullet impact strikes on the front windshield, and three on the driver's side rear door.

She also recovered shattered glass and black-colored shattered glass from the intersection of Clairmount and 14th, in the area of the traffic light there.

Detroit Police Sergeant Matthew Gnatek testified that he was assigned to the Homicide Unit. He testified that he became the officer in charge of the case when he inherited the case from Investigator Fisher, who left the Unit.

He was asked if he had some information from James Tate about a couple of young men who he ran across who made statements to him (Tate) about the homicide. He responded that he did. He was asked if he made any efforts to locate these two young men; he responded that he did. He testified that he found an address where the two possibly lived and went there. At that address, he talked to one Yvonka Ulmer, who apparently was the mother of the two young men. She was less than hospitable and did not want her two children involved at all. She said that they would not talk about what they saw. He never actually saw the children on that visit. One of the children, Antonio, was 17 years old, and the other, John, was 13 or 14.

He did attempt to subpoena the two individuals. He went to the address were he went previously and was not able to find them.

The defense called no witnesses.

Pl.-Appellee's Br. on Appeal, in *People v. Powels*, No. 283213 (Mich. Ct. App.), at 3-15 (citations to trial transcript omitted); *see also*, Def.-Appellant's Br. on Appeal, at 1-8.

Following his conviction, as part of his appeal, petitioner filed a motion for a new trial in the trial court, asserting that his trial counsel was constitutionally ineffective. The trial court held an evidentiary hearing on the motion. The testimony from that hearing is likewise accurately summarized in the prosecutor's brief in the Michigan Court of Appeals:

Richard Cunningham testified that he was Defendant's trial counsel. He was appointed on the case prior to the withdrawal of the previous attorney, which was sometime after the preliminary examination. How it came about that he was appointed was that he was in court for a final conference on another case and the judge asked him to approach the bench, after which the judge offered him the

11

opportunity to represent Defendant. Defendant's attorney had withdrawn from the case and the judge was looking for another attorney to represent Defendant. He told the judge that he would take the case. A pretrial date was then scheduled for the purpose of setting a new trial date; a trial date had already been set but that was before the previous attorney for Defendant withdrew. His appointment to the case occurred in August of 2007.

The pretrial had been set for August 24, 2007, and he went to the Jail to visit Defendant on the 23rd. He did not see Defendant that day, however, because he had asked to see Michael Powels, and Defendant was in Jail under the name Lee Powels. Defendant's being in Jail under the name of Lee Powels also created a problem with the scheduled pretrial hearing on August 24. But that did get cleared up and a pretrial was conducted on August 29. It was on August 29 that he had his first meeting with Defendant, in the courtroom. He had already received discovery from the previous counsel, and so, he knew what the case was about. It was on this date that Defendant told him that he had an alibi defense. He asked Defendant at that point to write the names of the alibi witnesses and where he could get a hold of them. A new trial was set on that day.

The next time that he saw Defendant was on September 6, 2007. Defendant was still in the Jail, serving time on another case, and he visited Defendant there. On that day, he gave Defendant the preliminary examination transcript. From then on, he had no face-to-face contact with Defendant. Defendant was, however, a rather prolific letter writer. He would receive very long letters from Defendant, in which Defendant would talk about everything in the world except what he (Cunningham) had asked him for, that is, the names and contact information of his alibi witnesses. Defendant kept telling him that he would get him the information that he had asked him for, but he never did. As a matter of fact, in one of Defendant's letters, Defendant actually wrote, "You know, I have five alibi witnesses," but again, when he asked Defendant to provide him with the names and contact information of these witnesses, Defendant never did.

On the day that the trial was set to begin, when Defendant was brought out, he told Defendant that he was very disappointed that Defendant had not gotten him the information about the alibi defense. He explained to Defendant that an alibi defense would have been pretty weak at this point because the alibi witnesses would just be coming forward now, after six months. When asked if he requested a continuance from the trial court on the day of the trial, Mr. Cunningham responded that he saw no reason to. He repeated that he never had contact with any potential alibi witness.

When asked if he was ever contacted by any family members or potential alibi witnesses, Mr. Cunningham responded that after the trial was over, Defendant's mother contacted him. His mother called and left him a voice mail asking him for a copy of Defendant's affidavit. What he found out that Defendant's mother really wanted were the letters that Defendant had sent him prior to trial. He sent the mother the letters that Defendant had sent him prior to trial.

On cross-examination, Mr. Cunningham reiterated that even on the morning

12

of trial, Defendant had still not given him the names of any alibi witnesses, and he said to Defendant that morning, "You never followed up. You never sent me what you were supposed to." Defendant never responded to this. The only thing Defendant ever told him about an alibi was that he was with five people, which is what he stated in one of his letters, but he never said where he and these other people were at the time of the murder.

On redirect examination, Mr. Cunningham was asked about two young alleged witnesses and why he waived their production. Cunningham responded that the did not want the two witnesses produced because they would have apparently testified that they saw Defendant in the car at the time of the shooting. He did not want their live testimony and did not think that testimony about what they told somebody else would be admissible.

Tarsheema Powels testified that she was Defendant's sister.

She was asked if she knew Defendant's whereabouts on June 18, 2006. She responded that Defendant was at 2161 Grey Street, which was her home. Defendant came to her house at about 5:15 p.m., on June 17, 2006, the day before, and he stayed at her house until June 20. Defendant was at her house in the early morning of June 18 and he never left her house.

After Defendant was arrested, she tried to contact his attorney. She spoke to Defendant's first lawyer, Mr. Posner, and she left messages with Mr. Cunningham's answering service, but she never got a return call from him.

On cross-examination, the witness was asked if she was saying that she remembered the date of June 18, because it was Father's Day; she responded that that was correct. When asked what was going on at her house that day, the witness responded that she was preparing a barbeque, not for her father, but for fathers in general.

She was asked if she ever went to the police with her information about Defendant's whereabouts on June 18. She responded that she did not. She was asked if she knew that Defendant had been charged with a crime that had occurred on that date; she responded that she was unaware of that. She testified that she only found out when she went to the court hearing, in 36th District Court. She did tell Mr. Posner of Defendant's whereabouts on June 18 and Posner told her to put it in writing because he would need her as a witness. She never did write out a statement.

Deron Rapley testified that he knew Defendant and he knew James Tate. Defendant's street name was Toot.

He testified that one day, he and James Tate were sitting around trying to come up with a plan to get some money. Tate came up with a plan to break into Toot's house, which he and Tate did, later on that day. They got about $5,000, some clothes, some jewelry, and a couple of pairs of shoes from the break-in. The next day, he and Tate were "chillin'" and they learned that "Double R" had been killed. The police apparently did not have any leads as to who did it. Tate told him that they should tell the police that Defendant did it, so that he (Toot) (Defendant) would not find out that he and Tate had broken into his house.

On cross-examination, the witness was asked if he had this information when

13

Defendant was being tried for murder. He responded that he did not; he never even knew that Defendant was charged with murder. It was not until he was in prison and Defendant was in the same prison with him, and he heard Defendant talking about the murder of "Double R," that he learned about the murder. He waited for a couple of days until he could get Defendant by himself, and then he told Defendant that he did not commit the crime that he was accused of, that Tate had told him that he was going to "lie on him" to get him off of the streets.

DaJuane Lee testified that he knew Defendant. He was also reminded that June 18 was Father's Day when asked if he remembered where he was that day. He responded that he was over at Tarsheema's house.

He had gotten there the night before and had spent the night. He saw Defendant that morning (June 18) at around 7:00 a.m., when everybody got up, and then continuously after that. He never saw Defendant leave Tarsheema's house.

On cross-examination, the witness testified that he called Defendant's attorney, Richard Cunningham, two or three times and left messages and Cunningham never returned his calls.

On examination by the court, the witness was asked if he attended any of the court proceedings after Defendant was arrested and charged; he responded that he did not. He was asked if he was aware that Defendant had been arrested and charged. He responded that he was not, not until Defendant was sentenced anyway; he came down to court on that day. When asked [why he] had just testified that he called Mr. Cunningham several times, the witness responded that he did not know about the dates "that was going on." When asked if he was saying that he just found out about the date of the murder when he came to court, the witness responded that Defendant's mom told him that Defendant had been charged.

[Defendant Michael Powels testified next]. When asked when his first contact with Mr. Cunningham had been, Defendant responded that Cunningham had been appointed in late August by the trial court because his previous attorney had withdrawn. The first time that he saw Cunningham was that day, and Cunningham gave him his card and said that he would be around to see him; he had no conversation with Cunningham about the case at that time.

He was in the Wayne County Jail waiting for Cunningham to visit him. Cunningham did not come on the day that he said he would be coming. Instead, he showed up a week later and brought him his discovery. Cunningham only stayed briefly. Cunningham was acting like he was in a hurry. He was still able to tell Cunningham that he was innocent, that he had been on the other side of town, at 2161 Gray Street, when the murder happened. And, he told Cunningham that he had five alibi witnesses who would corroborate his whereabouts. Cunningham's first reaction was to tell him that he did not like to use alibi witnesses because he had seen them go bad. Cunningham told him that the prosecution's case looked weak and that the jury would look at it like the murdered guy got what he deserved.

He wrote Cunningham numerous letters prior to trial. Cunningham never asked him for the names of his alibi witnesses. That is why in one of his letters, he told Cunningham that if he needed the names and addresses of the witnesses, to

writ[e] him back and he would get them for him.  Cunningham never responded to any of his letters.

As far as any face-to-face contacts with Cunningham, Cunningham told him that he would have him brought back down to Wayne County at least a week or two prior to trial to go over defense strategy, but that never happened.  Instead, he was not writted back to Wayne County until the Friday before his trial, which was beginning two or three days later, on Monday.

Before he got to Wayne County on that Friday before the trial, he had his family try calling Cunningham.  He asked his family to do this because Cunningham was not responding to any of his calls or answering any of his letters.  On the Friday that he was writted down to the Wayne County Jail, Cunningham still did not come to see him.  Rather, he did not see Cunningham until the day of trial.  He was upset with Cunningham and he asked him to get the trial adjourned so that he could get his witnesses down here.  Cunningham responded that it was going that day.

On cross-examination, Defendant was asked why he did not testify at trial as to his whereabouts at the time of the murder.  Defendant responded that he was under the impression that if he testified, they could use his prior conviction against him, and Cunningham never assured him that they could not.

He testified that he had no attorney-client relationship with Cunningham. When asked how it was that Mr. Posner got off the case, Defendant responded that he and Posner had a difference about strategy.  He testified, however, that Posner was aware of his alibi defense and that he was going to present that defense.  But it was he who requested that Posner withdraw.  When asked if he ever requested that Mr. Cunningham withdraw, Defendant responded that he never had an opportunity to ask Cunningham to withdraw because Cunningham never returned any of his calls. When asked if he could have asked the trial court to replace Cunningham on the day of trial, Defendant acknowledged that he could have done that.

Defendant was then asked if, at the conclusion of the prosecutor's case, Mr. Cunningham asked him if it was his decision not to testify and he responded that it was; Defendant acknowledged this.  He was then asked if Mr. Cunningham then asked him, "And you and I agree on how we should proceed in this matter; is that correct?", and he responded, "Yes, sir."  Defendant acknowledged this as well. When asked if he would acknowledge that that would have been his chance to tell Judge Jackson that he had five alibi witnesses and that Cunningham was not calling them, Defendant acknowledged that.  When asked if he told Judge Jackson at the time that he was sentenced that Cunningham had not called his five alibi witnesses, Defendant responded that he did not.

On examination by the court, Defendant was asked why he did not put the names of the alibi witnesses in one of his letters to Mr. Cunningham. Defendant responded that Cunningham never asked him for the names.  When asked why he did not just list the names in one of the letters anyway, Defendant responded that he did have a letter to Cunningham in which he did list the names and numbers of alibi witnesses, which a counselor had notarized.  At this junction, the letter to which Defendant was referring was produced for the first time.  He was shown the letter

15

and identified it as a letter that he wrote to Cunningham, which was dated 10-14-07.

On further examination by the court, Defendant was asked where he lived in June of 2006 (sic); he responded that he lived in a house around Geneva and Hamilton.  When asked if there was a break-in of this house, he responded that there was.  When asked if he reported it to the police, Defendant responded that he did not.  When asked why he would not report a break-in where $5,000 was stolen, Defendant responded that he was "trying to put it together," to figure out who it could have been.

Getting back to the letter of 10-14-07, Defendant testified, on redirect examination, that in the letter, he wrote the following to Mr. Cunningham:

> I see you won't answer any of my phone calls, you're not answering any of my family's phone calls and you haven't replied to my letter pertaining about the alibi, so here's the names and numbers.
> I also have my family members, their phone numbers, and they been trying to call you.

He then, in the letter, listed the people he wanted called as alibi witnesses, with a couple of addresses and phone numbers.

On recross-examination, Defendant was asked about the name of the person who notarized his letter of 10-14-07, that being one James W. Perry.  Defendant stated that this person notarized his letter when he (Defendant) was in prison.  When asked who Arus J. Perry [the purported signature of the notary] was, Defendant responded that he was a counselor in the prison.  When asked where James Perry's signature was (James W. Perry being the person whose notary stamp is on the letter), Defendant responded that he signed it Arus J. Perry.

Pl.-Appellee's Br. on Appeal, in *People v. Powels*, No. 283213 (Mich. Ct. App.), at 15-25 (citations to trial transcript and footnotes omitted); *see also*, Def.-Appellant's Br. on Appeal, at 8-13.

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the

adjudication of the claim--
>    (1) resulted in a decision that was contrary to, or involved an unreasonable
>    application of, clearly established Federal law, as determined by the Supreme Court
>    of the United States; or
>    (2) resulted in a decision that was based on an unreasonable determination
>    of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

However, "[i]n order for a federal court to find a state court's application of [Supreme Court]

precedent 'unreasonable,' the state court's decision must have been more than incorrect or

erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539

U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.  As the Supreme Court has

explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was

meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).  As the Court explained, "[s]ection

2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state

criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)).  Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).  The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme

18

Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Prosecutorial Misconduct (Claims II-III, VI)*

Petitioner first contends that he was denied due process by several instances of prosecutorial misconduct.[2]  In his second and third claims, petitioner contends that the prosecutor made improper comments that deprived him of a fair trial.  In his sixth claim, petitioner contends that police witnesses and the prosecutor presented false evidence.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.[3]

---

[2]Petitioner's arguments regarding the prosecutorial misconduct issues are not fully developed in his petition or his reply brief, and thus in addition to those materials I also look to petitioner's state court briefs.

[3]Respondent contends that part of petitioner's Claim III and all of Claim VI–as well as part of Claim IV and all of Claims V and VIII–are barred by petitioner's procedural default in the state courts, based on petitioner's failure to object to the various errors in the trial court.  With respect to each claim, however, petitioner raises a claim that counsel was ineffective for failing to raise a proper objection.  If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Consideration of counsel's effectiveness, however, depends in part on consideration of petitioner's underlying claims.  Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).
With respect to petitioner's arguably defaulted claims, the Michigan Court of Appeals reviewed the merits of each claim to determine whether petitioner could establish plain error.  The Sixth Circuit

1.     *Improper Comments*

Petitioner first contends that he was denied a fair trial by several improper arguments made by the prosecutor.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

*a.  Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted).  *Darden* constitutes "[t]he 'clearly established Federal law' relevant" to a prosecutorial misconduct claim.  *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  "[T]he *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case-determinations.'" *Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In reviewing whether a prosecutor has deprived a defendant of a fair trial, a court may not consider the prosecutor's conduct in isolation, but must the conduct in the context of the entire proceedings.  *See Brown v. Payton*, 544 U.S. 133, 144 (2005); *United States v. Young*, 470 U.S. 1, 11 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 636, 645 (1974).  Even on direct review, where AEDPA deference does

---

has "squarely endorsed the view that 'a federal constitutional claim reviewed by a state court for "plain error" can be considered "adjudicated on the merits" for the purpose of receiving deference under AEDPA.'" *Bond v. McQuiggan*, 506 Fed. Appx. 493, 498 n.2 (6th Cir. Nov. 29, 2012) (quoting *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009)).  Thus, the AEDPA standard of review set forth in § 2254(d) applies to petitioner's arguably defaulted claims.

not apply, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."  *Young*, 470 U.S. at 11.

### b. Analysis

Petitioner contends that he was denied a fair trial when the prosecutor improperly referenced the attorney-client privilege.  During rebuttal argument, the prosecutor stated:

> The facts show that this Defendant was there and participated.  Because going back to the beginning of this case in opening statement Mr. Cunningham said that, yeah, Watson did this, Watson got mad, he went and got a shotgun and he went and acting in self-defense shot up Mr. Sawyer.  Good.  Mr. Cunningham was there.  Or is he talking to someone in an attorney-client relationship with somebody that was there –

Trial Tr., Vol. II, at 142.  Counsel immediately objected, and the trial court sustained the objection, ruling "[t]hat's improper to make that argument, please.  Totally improper."  *Id*.  Counsel subsequently moved for a mistrial.  The trial court denied the motion, reasoning:

> I readily agree that that kind of comment could be very dangerous in a certain context and circumstance because certainly the attorney client privilege is to be respected.  But I think, one, in that context and how it was said, the fact that I did interrupt the flow of that before anything was said on that – I don't know if the wording was, was suggesting that the defense was saying some things that if he wasn't there, he must have gained something out of that.  That would certainly intrude on whether or not the defendant made some admissions to counsel.  But, again, I stopped it and I think I told the jury to ignore that.  I can give them another instruction.  But I think in the context of that and how it was said it doesn't merit a mistrial and I did stop it in time.

*Id*. at 152-54.  The court offered to give another curative instruction, and defense counsel accepted the court's offer.  The court then instructed the jury:

> Members of the jury, as I said to you earlier here, what the lawyers say is not evidence.  And before the lawyers made their, start[ed] making their arguments to you I indicated then that you rely on the evidence and not on what the lawyers say.  A couple of things occurred during the course of the arguments and I just want to give sort of a special instruction for [sic].
>
> One, there was some, in the context of some statement made that Mr.

21

> Cunningham was either, if he wasn't there, then he must have had some information. You cannot in any way rely or base any kind of a decision in the case on that. It was just argument being made in response to something. You can't look at what might have been said to Mr. Cunningham by anybody else in any kind of way, particularly by his client. You can't in any way base anything on that.

*Id*. at 154-55.

The Michigan Court of Appeals rejected petitioner's claim. The court agreed that the prosecutor's remark was improper, but found that it did not deprive petitioner of a fair trial because "the trial court immediately interjected and announced that the remark was totally improper," and "provided an emphatic curative instruction." *Powels*, 2010 WL 3238927, at *5. Because petitioner could not "explain[] how the trial court's instruction in the instant case was insufficient to cure the prejudicial effect of the prosecutor's remarks," *id*., the trial court did not err in failing to grant a mistrial. The Court should conclude that this determination was reasonable. In context, it is apparent that the prosecutor was arguing that the jury should ignore defense counsel's argument that petitioner was not present because counsel himself was not at the scene of the crime and could not know whether petitioner was there or not unless someone had told him. While the latter part of the argument crossed the bounds of acceptable argument, it did not directly implicate petitioner's statements to counsel; rather, it referred to what "someone" may have told counsel, the import actually being someone other than petitioner, if petitioner in fact was not at the scene. In any event, the trial court immediately and strongly condemned this argument, and gave a specific curative instruction addressing the prosecutor's argument. The Court must presume that the jury followed this instruction. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *see also*, *Shannon v. United States*, 512 U.S. 573, 585 (1994); *United States v. Olano*, 507 U.S. 725, 740 (1993); *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). In light of the trial court's quick and effective intervention,

the Michigan Court of Appeals's conclusion that petitioner was not denied a fair trial by the prosecutor's comment was reasonable.

Petitioner also contends that the prosecutor improperly bolstered Tate's testimony by effectively testifying that Tate had not been given a deal in exchange for his testimony. During rebuttal argument, the following exchange occurred:

| | |
|---|---|
| MS. SIRINGAS: | . . . . I'll give you something about Mr. Tate.  Is there any testimony that Mr. Tate asked for a deal?  That Mr. Tate got a deal?  We're under an obligation that if there was any deal, any discussion . . . |
| MR. CUNNINGHAM: | I'm going to object, your Honor. |
| THE COURT: | What's the objection?  I don't think there was any indication, anybody said that Mr. Tate got a deal.  I understand your argument but you can't bring in something that is not part of the record about what the obligation may be.  You can argue that point but I think you can't vouch for it in a sense. |
| MS. SIRINGAS: | Did you hear any testimony that he sought a deal, that he was given a deal?  That has to be disclosed.  Did you hear any testimony, any disclosure, anything about – |
| MR. CUNNINGHAM: | Your Honor, that's my objection. |
| THE COURT: | The part about it has to be disclosed, that is the part objected to. |
| MS. SIRINGAS: | All right, your Honor.  Nothing about a deal.  This is something that counsel is making up. . . .  That's what he's trying to do.  Just throw you off. |

Trial Tr., Vol. II, at 145-46.  The court of appeals rejected petitioner's claim, concluding that the prosecutor's comment was "responsive to defense counsel's unsupported argument that Tate had tried to 'save his own neck' by entering into a deal."  *Powels*, 2010 WL 3238927, at *5.  This

23

determination was reasonable.

Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[4]  Here, the prosecutor's comments did not place the prestige of the government behind the witness by making personal assurances of a witness's veracity, nor did the prosecutor imply that she knew of facts that had not been introduced.  Rather, the prosecutor merely explained that there was no evidence that Tate had sought or been offered a deal, contrary to the argument of defense counsel. The prosecutor's comment was therefore properly responsive to defense counsel's argument. responsive to petitioner's strategy in defending the case, as laid out in counsel's closing argument. *See Darden*, 477 U.S. at 182 (one factor in evaluating claims of prosecutorial misconduct is whether the prosecutor's statements were "invited by or was responsive" to the defense).  Nor did the prosecutor refer to facts not in evidence by explaining that the prosecutor was obligated to disclose any deals given to prosecution witnesses.  This was not a reference to any facts outside the record, but rather was a statement of law, and a correct one at that.   *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972).  Accordingly, petitioner is not entitled to habeas relief on this claim.

Petitioner next argues that the prosecutor misstated the evidence when she discussed Tate's testimony about what Antonio and John said: "[Tate] says I go up there, I see him, on the way back

---

[4]Some cases referring to only the first type of comment as "vouching" and describe the second type of comment as "bolstering."  *See Francis*, 170 F.3d at 551.

I see a couple of kids that are talking about it.  And what are they talking about what they heard. That the why [sic–white] SUV that Goldie and Tooty were in . . ." Trial Tr., Vol. II, at 148.  Tate had actually testified that the boys did not mention actually seeing petitioner and Watson, but said that it was the SUV that they normally drove.  The court of appeals rejected this claim, concluding that any prejudice was cured by the trial court's immediate instruction, following defense counsel's objection, that the lawyer's comments were not evidence and that the jury should rely on its collective memory of the testimony. *See Powels*, 2010 WL 3238927, at *5.  This determination was reasonable.  As the court of appeals explained, immediately after the prosecutor's comment, defense counsel objected, stating "that's not what the testimony was." Trial Tr., Vol. II, at 148.  The trial court immediately instructed the jury that the lawyer's statements were not evidence, and that the jury should disregard any statements different from the evidence and should let its "collective memories control about that."  *Id*. at 149.  The prosecutor agreed that "it's your recollection that controls," *id*., and continued by explaining her recollection of the testimony.  The trial court's instruction and the prosecutor's agreement that the jury's recollection of the testimony should control its decision cured any prejudice from the prosecutor's misstatement of Tate's testimony. *See United States v. Carillo*, 16 F.3d 1046, 1051 (9th Cir. 1994).

Petitioner next contends that the prosecutor improperly appealed to the jury's sympathy by arguing during her rebuttal: "Where is [the victim's] due process? [The victim's] due process was rendered by this Defendant and his buddy on the theory of self-defense, ladies and gentlemen.  this was not self-defense . . . .  It's purely an execution, purely vigilante justice carried through by this Defendant and Mr. Watson, ladies and gentlemen." Trial Tr., Vol. II, at 150-51.  The court of appeals found that this statement was not improper, reasoning that it was not an appeal to sympathy

by rather a "response to defense counsel's attempt to portray the victim in an unfavorable light and [the statements] merely imply that the victim was executed in retaliation for the incident at Belin's house." *Powels*, 2010 WL 3238927, at *6. Further, the court of appeals concluded, even if improper the prosecutor's comments "were not so egregious as to deprive defendant of a fair trial." *Id*. This determination was reasonable. The prosecutor's comment was a fair response to defense counsel's denigration of the victim. *See Darden*, 477 U.S. at 182. Further, even if the prosecutor's references to the victim were improper, they were much less prejudicial than other comments referring to victims which have been upheld on habeas review. *See, e.g.*, *Brechen v. Reynolds*, 41 F.3d 1343, 1355-56 (10th Cir. 1994); *United States ex. rel. Rockman v. DeRobertis*, 717 F. Supp. 553, 569-70 (N.D. Ill. 1989)(prosecutor's reference to victim "in his grave crying out for a guilty verdict" did not deprive petitioner of a fair trial); *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 896-96 (E.D. Ky. 1988)(petitioner was not denied a fair trial where, during the guilt-innocence phase of the trial, the prosecutor admonished the jury not to forget the victim because "he had a right to live."), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1999) (en banc). "Indeed, *Darden* itself held that a closing argument considerably more inflammatory than the one at issue here did not warrant habeas relief." *Parker*, 132 S. Ct. at 2155 (citing *Darden*, 477 U.S. at 180, nn. 11 & 12 (prosecutor referring to defendant as an "animal" and stating "I wish I could see [the defendant] with no face, blown away by a shotgun.")). Accordingly, petitioner is not entitled to habeas relief on this claim.

In short, the Michigan Court of Appeals thoroughly analyzed each of petitioner's prosecutorial misconduct claims, applying the appropriate due process test under *Darden*. For the reasons set forth above, the Michigan Court of Appeals's application of that test was reasonable. "[B]ecause the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching

26

outcomes in case-by-case determinations,' [this Court] ha[s] no warrant to set aside the [Michigan Court of Appeals's] conclusion." *Parker*, 132 S. Ct. at 2155 (citation omitted) (quoting *Yarborough*, 541 U.S. at 664). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his prosecutorial misconduct claims.

    2.    *False Evidence*

Petitioner also argues that the police and prosecutor presented false testimony. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

*a. Clearly Established Law*

It is well established that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted); *accord Napue v. Illinois*, 360 U.S. 264, 271 (1959). This is true whether the false testimony goes to the defendant's guilt or to a witness's credibility, *see Napue*, 360 U.S. at 270, and it matters not whether the prosecution directly elicits the false testimony or merely allows false testimony to go uncorrected, *see id.* at 269. To succeed on this claim petitioner must show that: (1) the prosecutor presented evidence which was false; (2) the prosecutor knew of the falsity; and (3) the evidence was material. *See Coe v. Bell*, 161 F.3d 320, 343

With respect to the first element, it is well established that petitioner bears the burden of proving that the testimony amounted to perjury. As the Fourth Circuit has explained, "[a] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured. Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir.

27

1987); *accord United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990) ("[N]ot every testimonial inconsistency that goes uncorrected by the government establishes a constitutional violation."); *Horton v. United States*, 983 F. Supp. 650, 657 (E.D. Va. 1997); *United States v. Hearst*, 424 F. Supp. 307, 318 (N.D. Cal. 1976). (6th Cir. 1999). As the *Verser* court further explained, to establish a constitutional violation petitioner must show that the "inconsistent testimony amounted to perjury, 'the willful assertion under oath of a false, material fact.'" *Verser*, 916 F.2d at 1271 (quoting *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984)); *see also*, *Horton*, 983 F. Supp. at 657 (quoting *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995)) (in order to establish *Napue* violation defendant must show that the government knowingly used perjured testimony, perjury being "false testimony concerning a material matter, 'given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory.'"). In other words, petitioner must show that the testimony was "indisputably false." *Byrd v. Collins*, 209 F.3d 486, 817-18 (6th Cir. 2000).

With respect to the second element, as the Sixth Circuit has explained in order for a witness's perjury at trial to constitute a basis for habeas relief, the petitioner must show "prosecutorial involvement in the perjury." *Burks v. Egeler*, 512 F.2d 221, 229 (6th Cir. 1975). The Sixth Circuit has repeatedly reaffirmed the requirement that a petitioner show prosecutorial involvement in or knowledge of the perjury. *See, e.g.*, *Rosencrantz v. Lafler*, 568 F.3d 583-84 (6th Cir. 2009); *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000); *King v. Trippett*, 192 F.3d 517, 522 (6th Cir. 1999); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998); *Ford v. United States*, No. 94-3469, 1994 WL 521119, at *2 (6th Cir. Sept. 23, 1994); *Akbar v. Jago*, No. 84-3540, 1985 WL 13195, at *1 (6th Cir. Apr. 10, 1985); *Roddy v. Black*, 516 F.2d 1380, 1383 (6th Cir. 1975). And the Supreme Court has

repeatedly characterized the Due Process Clause only as barring conviction on the basis of perjury known by the prosecution to be such. *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (emphasis added) ("[I]t is established that a conviction obtained through use of false evidence, *known to be such by representatives of the State*, must fall under the Fourteenth Amendment."); *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added) (due process is violated by the "*knowing* use of perjured testimony."); *see id.* at 103-04 & nn. 8-9 (discussing cases). At a minimum, "[t]he Supreme Court has never held that due process is offended by a conviction resting on perjured testimony where the prosecution did not know of the testimony's falsity at trial." *LaMothe v. Cademartori*, No. C 04-3395, 2005 WL 3095884, at *5 (N.D. Cal. Nov. 11, 2005) (citing *Jacobs v. Scott*, 513 U.S. 1067 (1995) (Stevens, J., dissenting from denial of certiorari) (noting that the Supreme Court has yet to consider the question of whether due process is violated by a conviction based on perjured testimony regardless of the prosecutor's knowledge)); *cf. Briscoe v. LaHue*, 460 U.S. 325, 326 n. 1 (1983) ("The Court has held that the prosecutor's knowing use of perjured testimony violates due process, but has not held that the false testimony of a police officer in itself violates constitutional rights.").

### b. Analysis

On direct examination Johnson, the taxi driver at the light where the shooting occurred, was questioned by the prosecutor regarding facts contained in the statement he gave to police, including the fact that he saw a handgun. On cross-examination, defense counsel elicited from Johnson that he did not see a gun, and that the statement he signed he was not the statement he gave to the officer. *See* Trial Tr., Vol. II, at 10-11. On re-direct examination, Johnson clarified that he did not see a gun, but he did see flashes and heard gunshots. *See id.* at 12-15. Petitioner contends that the prosecutor

29

presented false testimony by allowing Johnson to testify on direct examination that he saw a gun, based on the statement he signed but which he claimed was not his statement. The Michigan Court of Appeals rejected this claim, explaining that "the mere existence of [Johnson's] conflicting statements does not establish that the prosecutor knowingly permitted false testimony." *Powels*, 2010 WL 3238927, at *7. This determination was reasonable.

Inconsistencies between Johnson's testimony and his prior statement does not by itself establish that Johnson committed perjury or that the prosecution knew of the alleged perjury. Indeed, although Johnson testified on cross-examination that the statement he signed was not the statement he gave to the police, on direct examination he testified that the statement was in fact his, and that he did indeed tell the officer that he saw a handgun sticking out of the window of the white SUV. *See* Trial Tr., Vol. II, at 9-10. Because petitioner has failed to establish that Johnson's testimony was "indisputably false," *Byrd*, 209 F.3d at 817-18, or that the prosecutor knew of any falsity, the Michigan Court of Appeals's rejection of petitioner's claim was reasonable. Further, even if Johnson's testimony on direct examination was "indisputably false," the falsity was corrected by Johnson's further testimony on both cross- and re-direct examination. Because Johnson's allegedly false statement was "substantially corrected during [his] cross examination," there "is no reasonable likelihood that [Johnson's] false testimony on direct affected the jury's verdict." *United States v. Garcia*, 502 Fed. Appx. 663, 665 (9th Cir. 2012); *see also*, *United States v. Pauleus*, 415 Fed. Appx. 206, 206-07 (11th Cir. 2011); *cf. United States v. Franks*, 511 F.2d 25, 34 (6th Cir. 1975) (noting that "even where false evidence has been 'corrected' by subsequent defense cross-examination, rather than by the government ab initio, courts have found no prejudicial error."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Evidentiary Claims (Claims IV & V)*

In Claims IV and V, petitioner challenges the trial court's admission of certain evidence. In Claim IV, petitioner contends that the court erred in admitting Tate's testimony regarding the hearsay statements of Antonio and John under the excited utterance exception to the hearsay rule, and that the admission of these hearsay statements violated his Sixth Amendment right to confront the witnesses. In Claim V, petitioner contends that he was denied a fair trial by the prosecutor's use of Tate's "editorialized" statement to the police, which he contends amounted to hearsay. The Court should conclude petitioner is not entitled to habeas relief on these claims.

1.      *Hearsay Evidence*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable

31

in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994). In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

Here, the Michigan Court of Appeals determined that the statements of the two missing witnesses that Tate related in his testimony were admissible under the excited utterance exception to the hearsay rule, MICH. R. EVID. 803(2). *See Powels*, 2010 WL 2328927, at *7. The court also determined that the trial court did not improperly admit a hearsay statement in the form of Tate's statement to the police, which petitioner claims was "editorialized" by the police. The court explained that Tate's statement was not introduced, but was merely used to refresh Tate's recollection, and that "Tate's answers substantially confirmed the statements in the police report." *Id*. Because the actual statement was not introduced and was used merely to refresh Tate's recollection, "it was not used to establish the truth" of the matter asserted and thus was not hearsay. *Id*. As noted above, the question is not whether these evidentiary rulings were correct as a matter of state law. Rather, the only question is whether the evidence was so unreliable that its admission deprived petitioner of a fair trial. Tate's testimony regarding the circumstances under which the

missing witnesses made their statements supported the trial court's finding that their statements where "relating to a startling event or condition [and] made while . . . under the stress of excitement caused by the event or condition," MICH. R. EVID. 803(2), namely the shooting they had just witnessed, and thus were excited utterances. Because the statements were excited utterances, they were not so unreliable that their admission deprived petitioner of a fair trial. *Cf. White v. Illinois*, 502 U.S. 346, 356 (1992) (in Confrontation Clause analysis, excited utterances are presumptively reliable). And because Tate's statement to the police was not introduced into evidence, but was merely used to refresh his recollection, petitioner cannot show that he was denied a fair trial by use of Tate's statement. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### 2.   *Confrontation*

Petitioner also contends that the admission of the missing witnesses' excited utterances deprived him of his right to confront the witnesses. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a.   *Clearly Established Law*

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process Clause. *See Pointer v. Texas*, 480 U.S. 400, 406 (1965). In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude unreliable, out-of-court statements in criminal proceedings. Thus, the Court reasoned:

33

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable.  Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66.  As the Court explained in *Roberts*, reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception.  The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [their] reliability." *Idaho v. Wright*, 497 U.S. 805, 821 (1990).  Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [the exception] comports with the substance of constitutional protection."  *Roberts*, 448 U.S. at 66 (internal quotation omitted).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements.  After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59.  The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause.  *See id*. at 60-68.  The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes:

34

confrontation." *Id.* at 68-69. In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68. The Court did, however, provide some guidance. Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (internal quotations and citations omitted). While the Court declined to adopt any of these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68.

*Crawford* establishes a confrontation rule with respect to "testimonial" statements; it has no application to non-testimonial hearsay. In *Crawford*, the Court suggested, but did not definitively rule, that the Confrontation Clause is limited to regulating the introduction of testimonial hearsay, and has no application at all to the admission at trial of non-testimonial hearsay. The Court explained that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68. The Supreme Court has since clarified that the Confrontation Clause is simply not implicated by the introduction of non-testimonial hearsay. In *Davis v. Washington*, 547 U.S. 813 (2006), the Court explicitly addressed this question of "whether

35

the Confrontation Clause applies only to testimonial hearsay," *id*. at 823, and in doing so abrogated *Roberts* in whole.  The Court noted that the answer to this question was suggested in *Crawford*, when the *Crawford* decision explained that the Confrontation Clause focuses on "witnesses" who give "testimony."  *Id*. at 823-24 (discussing *Crawford*, 541 U.S. at 51).  The *Davis* Court explained that "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter."  *Id*. at 824  Thus, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all, and need not be considered.  *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability.  Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Pugh*, 273 Fed. Appx. 449, 454 (6th Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

### b.  Analysis

The Michigan Court of Appeals rejected petitioner's claim, reasoning that under *Crawford* "there is no basis for concluding that the statements in question qualify as testimonial in nature because they were not made under circumstances that would lead a witness to reasonably believe that the statements would be available for use at a trial."  *Powels*, 2010 WL 3238927, at *7 n.2.  This determination was reasonable.  The testimony at trial established that the statements at trial were excited utterances made immediately after the shooting by two bystanders, and made to another bystander.  The statements were not made to the police or in any court setting, and were merely expressions of the witnesses' excited reactions to the events they had witnessed.  They were

36

therefore not "testimonial" statements subject to the Confrontation Clause.  *See United States v. Franklin*, 415 F.3d 537, 545 (6th Cir. 2005) (statements made to a "friend and confidant" are not testimonial for purposes of the Confrontation Clause); *Evans v. Luebbers*, 371 F.3d 438, 445 (8th Cir. 2004) (murder victim's statements to friends that defendant had abused her like O.J. Simpson and that she might end up like Nicole Simpson were considered nontestimonial); *cf. Crawford*, 541 U.S. at 51 ("[A] formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Jury Instructions (Claim VIII)*

In his eighth claim, petitioner contends that he was denied a fair trial by improper jury instructions. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

In order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  If an instruction is ambiguous and not necessarily

37

erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury

has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S.

at 72 & 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). In short, instructional errors of state

law will rarely form the basis for federal habeas corpus relief. *See Estelle*, 502 U.S. at 71-72.

 2. *Analysis*

 At trial, in addition to denying involvement in the crime petitioner argued that Watson had

acted in self-defense, and that the person with Watson therefore acted in lawful defense of others.

In instructing the jury on the defense, the trial court twice incorrectly referred to what the

"defendant" knew or had the right to do, but immediately corrected its mistake. The court prefaced

its instruction on self-defense with the following explanation:

> Now, you heard mentioned earlier about self-defense. I'm going to put this
> in context here. If I understand the argument is that in order for – you have to look
> at whether or not Mr. Watson here acted in self-defense, and that if he acting [sic]
> in self-defense, then that could not have been a crime of murder, therefore no aiding
> and abetting.
>  So, essentially the Defendant himself is not claiming self-defense. He is
> claiming that the other person acted. And that if he was lawfully acting in self-
> defense, then he could not have aided and abeted [sic] that particular matter.

Trial Tr., Vol. II, at 168. The court then gave a standard self-defense instruction, for the most part

referring to Watson. Twice, however, the trial court inadvertently substituted "defendant" for "Mr.

Watson," immediately correcting itself after doing so:

> Now, there's been some evidence that the complainant, decedent, may have
> committed violent acts in the past and that the Defendant knew about these facts –
> strike that.
>  Watson knew about these acts. You may consider this evidence when you
> decide whether he honestly and reasonably feared for his safety at the time that he
> acted.
>  Now, a person who started an assault on someone else with deadly force or
> with a dangerous deadly weapon cannot claim he or she acted in self-defense unless
> he or she generally stopped fighting or assaulting and clearly let the other person

38

> know that he or she wanted to make peace.  Then if the other person kept on fighting
> or started fighting again later, the Defendant had the same right – strike that.
>     Watson had the same right to defend himself or anyone else and could use
> force to save himself from immediate feeling [sic] or harm.

*Id*. at 170-71.

Petitioner has failed to explain how these instructions prejudiced him in any way.  It was clear from the entirety of the trial court's instructions that the issue was whether Watson acted in lawful self-defense, thus rendering the shooting justified and petitioner not liable as an aider and abetter.  The instructions repeatedly referred to what Watson knew and believed, and what Watson was permitted to do.  The two brief references to "defendant," rather than Watson, were immediately and clearly corrected by the trial court.  In these circumstances, petitioner cannot show that the trial court's misstatement deprived him of a fair trial.  *Cf. United States v. Neuner*, ___ Fed. Appx. ___, ___, 2013 WL 3456747, at *2 (5th Cir. July 10, 2013); *United States v. Rodriguez*, 525 F.3d 85, 106 (1st Cir. 2008).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Counsel Claims (Claims I, VII-VIII)*

Finally, petitioner raises several claims that counsel was constitutionally ineffective.  Specifically, petitioner claims that counsel was ineffective for failing to: (1) investigate and call his alibi witnesses; (2) investigate and call *res gestae* witnesses or request a missing witness instruction with respect to these witnesses; and (4) object to the prosecutor's elicitation of "subtle" hearsay testimony, the introduction of Tate's editorialized statement, prosecutorial misconduct, and the erroneous jury instruction.  Petitioner also contends that he was completely denied counsel during the pre-trial period.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Denial of Counsel*

Petitioner contends that he was completely denied the assistance of counsel during the pre-trial period.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

As explained below, ordinarily to show a denial of effective assistance of counsel a petitioner must show both that counsel's performance was deficient and that he was prejudiced by counsel's performance under the *Strickland* test.  Petitioner contends, nevertheless, that he need not show prejudice once he establishes that counsel was ineffective.  Petitioner contends that counsel's failure to meet with him other than for brief periods of time amounted to a denial of counsel in the pretrial period, and that he is entitled to the presumed prejudice standard of *United States v. Cronic*, 466 U.S. 648 (1984), pursuant to which he need not establish prejudice on his ineffective assistance of counsel claims under the second prong of the *Strickland* test.  The Court should disagree.  The Supreme Court has limited the presumed prejudice standard to three types of ineffective assistance claims: (1) complete denial of counsel; (2) government interference with the right to counsel; and (3) conflicts of interest.  *See Smith v. Robbins*, 528 U.S. 259, 287 (2000) (citing *Strickland*, 466 U.S. at 692; *Cronic*, 466 U.S. at 659 & n.25).  The Supreme Court has stated that the first category–complete denial of counsel–encompasses both actual and constructive denials of counsel, and that a constructive denial of counsel can occur where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."  *Cronic*, 466 U.S. at 659.

The Supreme Court has recently explained, however, that for an ineffective assistance claim to come within this limited exception to *Strickland*, "the attorney's failure must be complete."  *Bell v. Cone*, 535 U.S. 685, 697 (2002).  The distinction is between "bad lawyering" and "no lawyering," *Woodard v. Collins*, 898 F.2d 1027, 1028 (5th Cir. 1990); *see also*, *Moss v. Hofbauer*, 286 F.3d 851,

861 (6th Cir. 2002), and the difference is not one of degree, but one of kind, *see Bell*, 535 U.S. at 697. Here, petitioner has not demonstrated that counsel completely failed to subject the prosecution's case to meaningful adversarial testing. Even under petitioner's version of events, counsel met with him at various pretrial proceedings and provided him with discovery. Further, counsel apparently conducted some investigation, argued various matters on petitioner's behalf, and extensively cross-examined the prosecution's witnesses. *See Moss*, 286 F.3d at 859; *Martin v. Mitchell*, 280 F.3d 594, 613 (6th Cir. 2002); *Cooks v. Ward*, 165 F.3d 1283, 1296 (10th Cir. 1998). All of petitioner's claims are run-of-the-mill pretrial and trial error claims subject to the *Strickland* framework. *See, e.g.*, *Patrasso v. Nelson*, 121 F.3d 297, 300 (7th Cir. 1997); *Gregory v. United States*, 109 F. Supp. 2d 441, 450 (E.D. Va. 2000). In short, "[t]he aspects of counsel's performance challenged by [petitioner] . . . are plainly of the same ilk as other specific attorney errors [the Supreme Court] ha[s] held subject to *Strickland*'s performance and prejudice components." *Bell*, 535 U.S. at 697-98.

Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003), does not compel a contrary conclusion. In *Mitchell*, the Sixth Circuit concluded that *Cronic* required a presumption of prejudice be applied to the petitioner's ineffective assistance claims. The court's conclusion was based on the fact that during the entire course of counsel's seven month representation, he had met with petitioner for only six minutes immediately prior to trial, and on the fact that in the month prior to trial counsel had been suspended from the practice of law, and thus did not appear at motion hearings or do any other work on the case. *See id.* at 742-44. *Mitchell* is not controlling here. Unlike in *Mitchell*, petitioner's counsel was not suspended from the practice of law in the month leading up to the trial. And, unlike in *Mitchell*, petitioner does not allege that counsel failed to meet with him at all; rather,

41

petitioner only claims that counsel failed to meet with him more than briefly.  The *Mitchell* court itself distinguished that case from the circumstances present here, noting that if the issue had been only the failure to meet and prepare in the thirty-day period prior to trial, "it might have been proper to apply the *Strickland* analysis, for as *Bell* notes, counsel's failure in particular instances is evaluated under *Strickland*."  *Mitchell*, 325 F.3d at 742.  The *Mitchell* court also distinguished the Sixth Circuit's prior decision in *Dick v. Scroggy*, 882 F.2d 192 (6th Cir. 1989).  *See Mitchell*, 352 F.3d at 744.  In *Dick*, the court applied *Strickland* to a claim based on counsel's failure to consult with the petitioner at all except for a 30-45 minute meeting the day before trial.  *See Dick*, 882 F.2d at 197.  Petitioner's case here is more akin to *Dick* than the egregious circumstances involved in *Mitchell*.  Indeed, petitioner's case is even less egregious than *Dick*.  Even accepting petitioner's version of events, counsel met with petitioner and with petitioner's first counsel to prepare for the case.

In short, *Mitchell* is a case involving unique facts–a complete failure to consult combined with counsel's suspension from the practice of law immediately prior to trial–and its holding is cabined by those unique facts.  *See Ivory v. Jackson*, 509 F.3d 284, 295 (6th Cir. 2007); *Johnson v. Bradshaw*, 205 Fed. Appx. 426, 432-33 (6th Cir. 2007); *Willis v. Lafler*, No. 05-74885, 2007 WL 3121542, at *29 (E.D. Mich. Oct. 24, 2007) (Edmunds, J., adopting Report of Komives, M.J.).  *Mitchell* does not cast doubt on the general rule that claims of ineffective assistance of counsel based on counsel's failure to consult with the petitioner or to adequately prepare are governed by the *Strickland* test.  *See, e.g.*, *United States v. Rogers*, 13 Fed. Appx. 386, 388-89 (7th Cir. 2001) (no presumption of prejudice with respect to claim based on counsel's repeated tardiness, lack of preparation, and failure to meet with petitioner, where no proceedings took place without counsel

present, counsel actively participated in the proceedings, and counsel subjected the prosecutor's case to adversarial testing); *cf. Chambers v. Maroney*, 399 U.S. 42, 53-54 (1970) (no prejudice found although counsel first appeared only a few minutes prior to trial). Accordingly, the Court should conclude that petitioner's claims are governed by *Strickland*.

     2.    *Ineffective Assistance*

     *a.  Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *Id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the

prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not

whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

### b. Alibi Witnesses

Petitioner contends that counsel was ineffective for failing to investigate and present his alibi witnesses. Following the evidentiary hearing, the trial court rejected petitioner's claim, concluding as a factual matter that petitioner never provided to counsel the names and contact information of his alibi witnesses:

> The crux of this matter is one of credibility. Trial counsel testified that the defendant did mention and they did discuss an alibi defense at their first contact. Counsel exhorted defendant to give him the information about the proposed witnesses; including expressing his frustration just before the trial because the defendant failed to provide the alibi information. As referenced above, the court is not persuaded that the defendant had a legitimate alibi defense. The facts of this case show that identity was not an issue. The defendant was no stranger to the trial witnesses, Sonya Carter and James Tate, who testified that they had known the defendant a long time, and saw defendant in the white SUV with Watson shortly before the shooting. In fact, according to Carter, Michael Watson and the defendant were best friends. The obvious circumstance that ties this all together is the motive of revenge by Watson who recruited his best friend to assist him. Sawyer and Watson fought. Sawyer left and came back with a gun looking for Watson. Michael Watson got his best friend, the defendant, and went gunning for Sawyer.
>
> The court finds a lack of credibility in the defendant and the persons who testified at the evidentiary hearing. The overall conclusion is that the alleged alibi defense is an after the fact creation. The court concludes this from the demeanor and testimony of the witnesses, and several objective supporting factors. For example, neither of the alibi witnesses, defendant's sister or Dajuane Lee, testified that they discussed alibi with trial counsel at court hearings and at the time of the trial. In fact, defendant's sister testified that she was at the preliminary examination. She also said that she never contacted the police to report that her brother was at her house. Both Lee and defendant's sister testified that the defendant was at the sister's house in the early morning hours of June 18, 2006. Neither gave testimony that anyone else was at the house. Yet the defendant said that he had five alibi witnesses. Significant also is that at no time during the pre-trial appearance, or during the four day jury trial did the defendant make any complaints about counsel['s] representation. In fact, the defendant stated on the court record that he did not want to testify. . . . Simply put, the defendant has not established the factual predicate for his claim of ineffective

> assistance of counsel.  The court concludes that counsel was not ineffective because counsel was never informed of the names and whereabouts of the alleged alibi witnesses.  The court concludes that the defendant's claim about notifying trial counsel of the alleged witnesses is not credible.

Memo. Op. & Order Denying Mot. for New Trial, *People v. Powels*, No. 07-009813-01FC, at 4-5 (Wayne County, Mich., Cir. Ct. July 23, 2009).  The Michigan Court of Appeals affirmed, finding no error in the trial court's factual findings.  *See Powels*, 2010 WL 3238927, at *2.  The Court should conclude that the state courts' rejection of petitioner's claim was reasonable.

The habeas statute provides that, in a habeas case, "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007) ("[I]n the context of a *Strickland* evidentiary hearing, it is for the judge to evaluate the credibility of the criminal defendant and the former defense counsel in deciding what advice counsel had in fact given to the defendant during his trial, and such findings are entitled to the Section 2254(e)(1) presumption.").  The Court must be particularly deferential with respect to the state court's credibility determinations, which "are virtually unreviewable by the federal courts."  *Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) (internal quotation omitted); *see also*, *LaTorres v. Walker*, 216 F. Supp. 2d 157, 167 (S.D.N.Y. 2000); *cf. Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. 2254(d) [the predecessor to § 2254(e)(1)] gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").  "'Clear and convincing evidence' within the meaning of § 2254(e) 'requires greater proof than preponderance of the evidence' and must produce 'an abiding conviction' that the factual contentions being advanced are 'highly probable.'  *Cooper v. Brown*, 510 F.3d 870, 919 (9th Cir. 2007) (quoting *Sophanthavong v.*

*Palmateer*, 378 F.3d 859, 866 (9th Cir.2004)); *cf. Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).[5]

Here, petitioner has presented no clear and convincing evidence that the trial court's credibility findings were erroneous. Thus, this Court must presume that petitioner did not provide to counsel the names and contact information of his purported alibi witnesses, despite counsel's repeated exhortations to do so. And, this being the case, petitioner cannot show that counsel was ineffective for failing to investigate and call at trial the alibi witnesses. It is well established that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. Because petitioner did not provide counsel the names and contact information of his alibi witnesses, counsel was not ineffective. *See Malpeso v. United States*, 38 Fed. Appx. 45, 47-48 (2d Cir. 2002); *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994); *Laurey v. Graham*, 596 F. Supp. 2d 743, 749 (W.D.N.Y. 2009). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Res Gestae Witnesses

---

[5]There is some dispute as to whether the § 2254(e)(1) presumption applies where a federal habeas court is considering only the evidence adduced in the state courts. Some courts have held that § 2254(e)(1) applies to all factual determinations, while others have held that § 2254(e)(1) applies only when a federal court develops new facts in an evidentiary hearing, leaving § 2244(d)(2)'s reasonableness determination as the sole means for evaluating state court factual findings where no additional evidence is adduced in the federal court. *See Wood v. Allen*, 130 S. Ct. 841, 848 n.1 (2010) (discussing split of authority). The Court granted *certiorari* on this issue in *Wood*, but ultimately declined to resolve it. *See id.* at 849. Although the Sixth Circuit has not explicitly decided this issue, it has repeatedly stated that, in making a reasonableness determination under § 2254(d)(2), a federal court must afford state court factual findings a presumption of correctness under § 2254(e)(1), and has done so in cases not involving any federal court evidentiary hearing. *See, e.g., Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008); *Dixon v. Jamrog*, 121 Fed. Appx. 93, 94 (6th Cir. 2005); *Finley v. Rogers*, 116 Fed. Appx. 630, 632 (6th Cir. 2004); *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003). Thus, the Sixth Circuit approach is in accord with those courts that hold § 2254(e)(1) applicable to all state court factual findings, regardless of whether the federal court conducts an evidentiary hearing.

Petitioner also contends that counsel was ineffective for failing to investigate the two *res gestae* witnesses who made excited utterances to Tate, for waiving the prosecutor's obligation to produce these witnesses, and for not requesting a missing witness instruction. The court of appeals rejected this claim, reasoning that "[d]efense counsel testified that he believed that these witnesses' testimonies would be unfavorable to defendant and defendant has not otherwise shown that their testimony would have been favorable." *Powels*, 2010 WL 3238927, at *3. The court also concluded that counsel was not ineffective for failing to request a missing witness instruction, because such an instruction would not have been warranted. *See id.* These determinations were reasonable.

At the evidentiary hearing, counsel testified he waived production of these witnesses because they would have testified that they saw petitioner in the white SUV from which the shots were fired. This testimony would have been consistent with their excited utterances to Tate. Petitioner did not present any evidence at the evidentiary hearing in state court to show that their testimony would have been favorable to petitioner. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same). Thus, "a petition for habeas corpus relief based on counsel's failure to call witnesses must present this evidence in the form of the actual testimony by the witness or affidavits." *United States ex rel. Townsend v. Young*, No. 01 C 0800, 2001 WL 910387, at *5 (N.D. Ill. Aug. 8, 2001) (citing *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)); *see also*, *Pittman v. Florida*, No. 8:05-cv-1700, 2008 WL 2414027, at *12 (M.D. Fla. June 11, 2008). Because there is nothing in the record to support petitioner's claim that these witnesses could have provided favorable testimony, petitioner cannot show that counsel was ineffective for waiving their

48

production by the prosecution.

Nor can petitioner show that counsel was ineffective for failing to request an instruction that the jury could draw an adverse inference from the prosecution's failure to produce these witnesses. The Michigan Court of Appeals determined that such an instruction was not warranted under state law. In analyzing petitioner's ineffective assistance of counsel claim, this expression of state law is binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). Counsel cannot be deemed ineffective for failing to request an instruction which was not appropriate under state law. *See Mitzel v. Tate*, 267 F.3d 524, 538 (6th Cir. 2001). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Failure to Object

Finally, petitioner contends that counsel was ineffective for failing to object to the unobjected-to instances of prosecutorial misconduct, the erroneously admitted evidence, and the trial court's improper jury instruction. With respect to the prosecutorial misconduct, as explained above petitioner cannot show that the prosecutor committed misconduct that deprived him of a fair trial. It follows that petitioner cannot show that he was prejudiced by counsel's failure to object. *See White v. Withrow*, No. 00-CV-74231, 2001 WL 902624, at *12 (E.D. Mich. June 22, 2001) (Rosen, J.) (citing *United States v. Nwankwo*, 2 F. Supp. 2d 765, 770 (D. Md. 1998)) (no prejudice from counsel's failure to object to prosecutorial misconduct where prosecutor's comments did not deprive petitioner of a fair trial); *Rich v. Curtis*, No. 99-CV-73363, 2000 WL 1772628, at *8 (E.D. Mich. Oct. 24, 2000) (Friedman, J.) (same). With respect to the evidence, the Michigan Court of Appeals

49

rejected each of petitioner's claims that the evidence was improperly admitted under state law.  As noted above, these "determination[s] of state law by a state appellate court [are] . . . binding in a federal habeas action." *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007); *see also*, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Gall v. Parker*, 231 F.3d 265, 303 (6th Cir. 2000) ("Principles of comity and finality equally command that a habeas court can not revisit a state court's interpretation of state law.").  Thus, in analyzing petitioner's ineffective assistance claim, the Michigan Court of Appeals's conclusion that the evidence was properly admitted is binding on this Court.  *See Narlock v. Hofbauer*, 118 Fed. Appx. 34, 34 (6th Cir. 2004) (per curiam); *Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999).  Because the evidence was properly admitted under state law, petitioner cannot be deemed ineffective for failing to object.  Finally, as noted above, the trial court's brief misstatements in the jury instructions were immediately corrected by the trial court and did not deprive petitioner of a fair trial.  Counsel cannot be deemed ineffective for failing to object to an error that was immediately cured by the trial court without the need for an objection.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these ineffective assistance of counsel claims.

H.      *Recommendation Regarding Certificate of Appealability*

        1.      *Legal Standard*

        As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that

50

"[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.""" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by §

51

2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2. *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability. With respect to petitioner's prosecutorial misconduct claims, as explained above most of the comments were not improper, and the comments as a whole did not deprive petitioner of a fair trial under the stringent *Darden* standard. Further, even if Johnson's direct examination testimony was false, the falsity was immediately corrected on cross- and re-direct examination. Thus, the resolution of petitioner's prosecutorial misconduct claims is not reasonably debatable. Because it is clear that errors of state evidence law are not cognizable on habeas review, and because it is clear that the hearsay evidence introduced at petitioner's trial was not "testimonial" hearsay, the resolution of petitioner's evidence and confrontation claims is not reasonably debatable. The trial court's brief misstatements during jury instructions were immediately corrected and did not affect the correctness of the instructions as a whole, and thus the resolution of petitioner's jury instruction claim is not reasonably debatable. Because petitioner has failed to present any clear and convincing evidence to rebut the trial court's credibility determinations regarding the alibi witness issue, and because under the facts determined by the trial court petitioner failed to provide the names and contact

information of his alibi witnesses to counsel, the resolution of this ineffective assistance claim is not reasonably debatable. Similarly, because counsel had a valid strategic reason for waiving the production of Antonio and John, and because petitioner has failed to show that they would have provided favorable evidence, the resolution of this ineffective assistance claim is not reasonably debatable. Finally, because petitioner's underlying evidentiary, prosecutorial misconduct, and instructional error claims are without merit, the resolution of petitioner's related ineffective assistance of counsel claim based on counsel's failure to object is not reasonably debatable. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

I.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health*

*& Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


          ___s/ Paul J. Komives_____
          PAUL J. KOMIVES
          UNITED STATES MAGISTRATE JUDGE

Dated:    ___9/4/13_____


## CERTIFICATION OF SERVICE

I hereby certify that a copy of this Report and Recommendation was sent to the Petitioner and

Counsel of Record on this 4th day of September, 2013.


          ___s/ Carol J Bethel_____
          CASE MANAGER